**EXHIBIT A**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> CARDINAL HEALTH, INC., <br> CARDINAL HEALTH 200, INC., <br> BBA GROUP U.S. HOLDINGS, INC. and <br> BBA NONWOVENS SIMPSONVILLE, INC., <br><br> Defendants. | Misc. Business <br> Docket No. 04-10106 <br><br> (Related Case Pending in the <br> Middle District of Tennessee <br> Case No. 3-03-0848) |

## AFFIDAVIT OF PHILIP KATZ

PHILIP KATZ, being duly sworn, deposes and says:

1. I am an attorney and a partner in Crowell & Moring, LLP ("C&M"), a law firm based principally in Washington, D.C. I am over the age of 18, and offer the information contained in this affidavit based on my personal knowledge and belief, and based on information provided to me.

2. E.I. DuPont de Nemours & Company ("DuPont") is a corporation based in Wilmington, Delaware. DuPont manufactures materials that are used, *inter alia*, in the manufacture of surgical gowns used in hospital operating rooms across the country.

3. TIAX, LLC ("TIAX") is a scientific research and development consulting firm headquartered in Cambridge, Massachusetts. TIAX provides research, product development, and

technology transfer services for clients. TIAX has expertise in fabric technology and standards that apply to protective clothing.

4. C&M has for years provided legal services to DuPont on a range of legal issues.

5. My practice involves, among other things, counseling clients regarding the requirements and restrictions imposed on manufacturers and distributors of medical products (*e.g.*, drug products and medical devices) under the Federal Food, Drug, and Cosmetic Act ("FFDCA") and implementing regulations, as enforced by the Food and Drug Administration ("FDA"). I also advise clients regarding application of the Lanham Act in private suits alleging false advertising. I often work closely with my partner, Scott Winkelman, whose practice includes counseling clients on issues of tort and contract law.

6. In or about July 2003, DuPont retained C&M to provide legal advice regarding regulatory and product safety issues involving surgical gowns and drapes, which are medical devices regulated by FDA under the FFDCA.

7. More specifically, DuPont sought legal advice regarding issues it might face under the FFDCA, which, *inter alia*, governs the conditions under which medical devices are permitted to be sold in the United States, grants FDA authority to remove devices from the market for matters of safety or effectiveness, provides for FDA regulation of labeling and advertising of devices, and establishes recordkeeping and reporting requirements regarding adverse health events that may be associated with a medical device. DuPont also sought legal advice regarding related common law tort liability, including the different legal obligations and defenses facing a component parts manufacturer as distinguished from the manufacturer of a finished product, duties to warn, post-sale duties, implications of voluntary undertakings, and product disparagement.

8. The legal advice outlined in Paragraph 7 often calls for expert scientific and technical expertise and guidance. For example, as a prerequisite to distribution in the United States, certain medical devices must be shown to be "substantially equivalent" in safety and effectiveness to devices already on the market. Although an attorney may advise a client in meeting this legal obligation, the attorney often may need to rely on a scientific or medical expert to be able to advise the client as to whether substantial equivalence has been shown, as required by the statute. Similarly, advising a client as to whether there is a legal obligation to report an adverse health event may require the attorney to seek the expertise of a medical or scientific expert as to causal relationships between the product at issue and the patient's condition.

9. In this particular instance, my colleagues and I determined that, to provide DuPont the legal advice it requested, we needed to acquire an understanding of a range of scientific and technical issues regarding the performance characteristics of surgical gown and drape materials under conditions that can occur in an operating room. As non-scientists, we did not ourselves have such knowledge or expertise, which was needed to understand and evaluate information DuPont provided to us, and to develop and analyze additional information necessary for context, both of which were essential to our providing legal advice to DuPont.

10. By way of example, we needed this expertise to understand the circumstances in which a company should approach FDA as to potential safety issues, and what and how to communicate to the agency if and when contact was made. Similarly, before advising DuPont as to tort and product disparagement law from public statements regarding safety issues, we would need to understand the nature and implications – for customers, consumers, the regulating agency, and others – of the safety issue at hand.

3

11. To obtain the necessary scientific and technical expertise, C&M hired TIAX in August 2003. C&M and TIAX memorialized their relationship by a letter dated September 26, 2003. That letter states that TIAX was hired "to assist [C&M] in providing legal advice to [DuPont] in connection with tort and regulatory issues regarding its surgical gown and drape fabrics." *See* September 26, 2003 letter, attached as Exhibit 1.

12. C&M relied upon the expertise of TIAX professionals to analyze information provided by DuPont, to develop and implement methodologies for testing the performance characteristics of gown and drape materials, and to analyze and explain the data resulting from such testing. The technical and scientific expertise of TIAX was necessary to facilitate our communication with DuPont, and to assist C&M in providing legal advice to DuPont. Without that expertise, my colleagues and I would not have had, nor would we have been able to assimilate, information integral to our analysis of the legal issues for which advice was sought.

13. TIAX issued to C&M a report, dated December 4, 2003, explaining TIAX's test methods, analysis, and findings. TIAX also issued to C&M an executive summary of the report. C&M provided the report and executive summary to DuPont, C&M's client.

14. From its retention forward, TIAX performed the work described above at the request of C&M.

15. In the course of its work, TIAX generated drafts of the report and executive summary that were furnished to C&M. My colleagues and I responded to the drafts with questions and suggestions, and generally communicated with TIAX as to the content and form of the report and executive summary. The drafts, as well as the communications about the drafts, contain information not in the final report, and reflect information communicated to C&M by its client, DuPont. They also reflect and relate to the legal advice given by C&M to DuPont,

4

including strategies for addressing FDA regulatory issues, possible tort liability, and advertising and disparagement law.

16. For example, in reviewing drafts of the report and executive summary, I suggested approaches that I believed would enhance the utility of the documents before FDA, if our client's legal strategy took us there. It was also through the back-and-forth of the drafting process that I raised questions and sought clarification regarding certain statements in the documents, to make sure that I understood the data, and the implications of the data, on which our legal analysis and advice were based.

17. TIAX and C&M have considered the materials described in Paragraph 15 to be confidential and subject to the attorney-client privilege, and treated the materials as such, taking steps to prevent their disclosure. The documents have not been made public nor, to our knowledge, shared outside the attorney-client relationship. This treatment is consistent with the terms of the TIAX-C&M letter. *See* Exhibit 1.

_____
Philip Katz

Subscribed and sworn to before me this
__3__ day of __May__ 2004.

_____
Notary Public
My Commission Expires: Feb. 14, 2009

5